UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


PAUL SAMMONS,

        Plaintiff,

v.                                      Civil Action No. 2:07-0132

DEPUTY CHAD P. BARKER,
individually and as a member
of the Boone County Sheriff's
Department and U.S. 119 Drug &
Violent Crimes Task Force,
SERGEANT J.J. LESTER,
individually and as a member of the
West Virginia State Police and U.S.
119 Drug & Violent Crimes Task Force,
and WEST VIRGINIA STATE POLICE,

        Defendants.


MEMORANDUM OPINION AND ORDER


        Pending are the motions for summary judgment of Deputy

Chad Barker ("Barker") and of Sergeant J.J. Lester ("Lester") and

the West Virginia State Police, each filed January 7, 2008.


I.


        On December 2, 2004, defendants Deputy Barker and

Sergeant Lester, along with the now-dismissed defendants Trooper

Smith and Trooper Robinson, all as members of the U.S. 119 Drug &

Violent Crimes Task Force, supervised three controlled drug buys by a confidential informant ("CI")[1] in Mingo County.  (Barker Depo. at 52, 54-55, attached as Ex. A to Barker's M.S.J.; Invest. Rpts. of All Three Buys 8500-0501, 8500-0502, 8500-0503, attached as Exs. B, C, and D to Barker's M.S.J.).  The target of the controlled buys was Virgil Sammons, brother of the plaintiff. (Invest. Rpts. 8500-0501, 8500-0502, 8500-0503, attached as Exs. B, C, and D to Barker's M.S.J.).  The CI wore a recording device which captured both video and audio recordings during the three drug buys.  (Id.).  The CI successfully purchased illegal drugs from Virgil Sammons on all three occasions.  (Id.).  The primary focus in this case is on the first drug buy.

### A.   The Three Drug Buys

        During the first drug buy on December 2, 2004, the CI was attempting to drive to Virgil Sammons' home on the right fork of Duncan Fork in Mingo County, but a mobile home was being moved and blocked traffic on the road leading into the hollow where the target resided.  (CI St'ment Re: First Buy, attached as Ex. E to

---

[1]  The pronouns in the record referring to the "CI" sometimes use "he" and other times "she."  For the sake of this memorandum opinion and order, the court will use "she" or "her," irrespective of the accuracy of that usage.

2

Barker M.S.J.; Invest. Rpt. 8500-0500, attached as Ex. B to
Barker M.S.J.).  While the CI waited, a conversation ensued
between the CI and Anthony Sammons (plaintiff's nephew and Virgil
Sammons' son) who was the driver of a truck ("first truck") that
had pulled alongside the CI's vehicle.  (Id.; Lester Depo. at 27-
29, attached as Ex. A to Pl.'s Resp. to M.S.J.'s).  In addition
to Anthony Sammons, this first truck contained another passenger,
who, according to Sergeant Lester's deposition testimony, was the
plaintiff.  (Lester Depo. at 29, attached as Ex. Ex. A to Pl.'s
Resp. to M.S.J.'s).  The CI told Anthony Sammons she would like
to "get some stuff," presumably meaning purchase drugs, and
Anthony Sammons inquired as to how much and advised that Virgil
Sammons would be back shortly.  (CI St'ment Re: First Buy,
attached as Ex. E to Barker's M.S.J.; Trans. of First Buy,
attached as Ex. E2 to Pl.'s Resp. to M.S.J.'s).  It is apparent
from the transcript and the CI's statements that the CI was
familiar with Anthony Sammons as the CI made statements such as,
"I didn't know that was you sitting there[,]" and "Where's Chubs
at?".  (Id.).

3

Shortly thereafter, a "second truck"[2] containing a driver, purported by the plaintiff to be Clarence Dempsey, (Pl.'s Resp. to M.S.J.'s at 4), and a passenger, Virgil Sammons, pulled in behind the CI's vehicle.  (CI St'ment Re: First Buy, attached as Ex. E to Barker M.S.J.).  Virgil Sammons spoke briefly with Anthony Sammons and advised the CI to "come here."  (Id.).  The CI left her vehicle and walked over to the second truck, the one in which Virgil Sammons was a passenger, and purchased crack cocaine.  (Id.; Barker Depo. at 63, attached as Ex. A to Barker M.S.J.).  Both occupants of the second truck, Virgil Sammons and the unidentified person, purportedly Clarence Dempsey, participated in the drug transaction.  (Barker Depo. at 63-64, attached as Ex. A to Barker M.S.J.).  Virgil Sammons advised the CI to "come back, and I will have powder at six o'clock."  (CI St'ment Re: First Buy, attached as Ex. E to Barker M.S.J.).

The second and third drug buys occurred inside the residence of Virgil Sammons on December 2, 2004.  (Invest. Rpt. 8500-0501, attached as Ex. F to Pl.'s Resp. to M.S.J.'s; Invest. Rpt. 8500-0502, attached as Ex. G to Pl.'s Resp. to M.S.J.'s).  The CI indicates when she arrived at Virgil Sammons' residence

---

[2]  Both the first truck and the second truck are sometimes referred to as vehicles and other times as trucks.

4

during the second buy, "I had to waite [sic] in the living room.
. . .  There were other people present that I did not know.
Ashley [illegible] was there.  I saw some . . . [illegible]
passing out needles and loading . . . [illegible].  I also saw
other money transactions made."  (CI St'ment Re: Second Buy,
attached as Ex. F to Barker M.S.J.).


      **B.**   <u>Preparation of the Reports of the Investigation</u>


Deputy Barker completed Investigation Report 8500-0500,
dated January 5, 2005, relating to the first drug buy,
designating himself as "operations officer."[3]  (Barker Depo. at
61-62, attached as Ex. A to Barker's M.S.J.; Invest. Rpt. 8500-
0500, attached as Ex. B to Barker's M.S.J.).  Following the first
drug buy, the CI met with the four drug task force members, and
Deputy Barker took the CI's written statement.  (Invest. Rpt.
8500-0500, attached as Ex. B to Barker's M.S.J.).  Based on his
later review of the videotape of the CI's recording, Deputy
Barker believed the driver of the second truck, the one

---

[3]  **The report for the second drug buy was completed by
Trooper Smith, and the report for the third drug buy was
completed by Sergeant Lester.  (Invest. Rpts. 8500-0501 and 8500-
0502, respectively, attached as Exs. C and D to Barker's M.S.J.).**

containing Virgil Sammons as a passenger, was involved in the
first drug buy either by handing the CI the drugs or taking the
CI's money and giving it to Virgil Sammons and thus could be a
co-conspirator in the delivery of crack cocaine.  (Barker Depo.
at 63-64, attached as Ex. A to Barker M.S.J.).

As an officer with the Boone County Sheriff's
Department, Deputy Barker, though he was familiar with Virgil
Sammons, was not particularly familiar with Mingo County
residents and asked Sergeant Lester, whom he knew to be stationed
in Mingo County prior to his duties with the task force, for help
(Id. at 64), as set forth in the following exchange in Deputy
Barker's deposition:

> Q    Tell me specifically how Paul Sammons' name came
>      to be in the January 5, 2005 report of
>      investigation?
>
>                    * * * *
>
> A    I asked Sergeant Lester, who was stationed in
>      Mingo County prior to his duties with the task
>      force, if he could indeed watch that video and
>      tell me who the other person was in the vehicle,
>      whether it be the driver or the passenger.
>
>                    * * * *
>
>      I asked Sergeant Lester if he could identify that
>      person for me on the video.  And I said simply,
>      Watch the video, tell me who the guy is in the
>      passenger seat or the driver seat, whichever seat
>      it was.

Q    Tell me who the individual is whose (sic) not
     Virgil; correct?

A    Absolutely.  No.  No.  I'm sorry.

                    * * * *

Q    And what was Trooper Lester's response?

A    I asked him again - - I want to clarify because I
     think you kind of mixed me up, and I answered
     before.

     I asked him to identify the person in the
     passenger's side or the driver's side of the
     vehicle, I didn't state any names, that the CI
     spoke to during the drug purchase on the tape.
     That was simply the bottom line, end of whatever.

     He came back to me and says, It's Paul Sammons.

                    * * * *

Q    How did Trooper Lester know this was Paul Sammons?
     What did he look at?

A    I have no idea.

Mr. Pullin: Objection to the form of the question.

A    Again, I want to clarify.  I did not watch the video
     with the Trooper Lester when he identified Paul
     Sammons.

     I asked him at some point between December 2 and
     January 5, tell me who the person is in the vehicle
     that the CI speaks with, either passenger or driver
     seat.

     He says, Okay.  I don't recall if it was that day, he
     came back and told me. I don't recall if it's the day
     after.  Some point between January 5 and December 2, he
     tells me Paul Sammons is the other person in the
     vehicle.

                         7

(Id. at 63-66).

Sergeant Lester viewed the tape alone and later advised Deputy Barker that the individual in question was Paul Sammons, the plaintiff. (Id. at 65-66; Lester Depo. at 28, attached as Ex. H to Barker's M.S.J.). Lester explained,

> I was asked to look at the video to see who it was,
> there were -- there was the CI's vehicle, there was a
> vehicle beside of it. And I was asked to identify one
> of the people in the truck. I identified him as Paul
> Sammons.

(Lester Depo. at 27, attached as Ex. B to Pl.'s Resp. to M.S.J.'s). It was only later that Sergeant Lester noticed the second truck in the videotape, which he now acknowledges is where the drug transaction occurred. (Id.).

Sergeant Lester admits that, at the time of the identification, he believed the plaintiff to be a passenger in the first (Anthony Sammons') truck. (Lester Depo. at 29-30, attached as Ex. H to Barker's M.S.J.). He also now acknowledges that if the drugs came from the second (Virgil Sammons') truck, then the plaintiff would not have had any involvement in the drug transaction. (Id.). When he viewed the tape, however, Sergeant Lester apparently did not realize that the suspect he was supposed to identify for Deputy Barker was in the second truck rather than the first truck. (Id. at 29-31). According to

8

Sergeant Lester, Deputy Barker "asked me to look at the video to see who the guys were in the truck."  (<u>Id.</u> at 31).  Sergeant Lester explained, "I see two guys in a truck there, and I said one was Paul.  It wasn't until after the fact . . . that I realized that there was other people behind that vehicle.  So I just looked at the wrong portion of the video."  (<u>Id.</u>).

As a result of Sergeant Lester's representation, Deputy Barker amended the investigation report of the first drug buy to add the plaintiff as a suspect.  (<u>Id.</u>; Barker Depo. at 66, 71, attached as Ex. A to Barker's M.S.J.; Orig. Invest. Rpt. 8500-0500, attached as Ex. E to Pl.'s Resp. to M.S.J.'s; Amend. Invest. Rpt. 8500-0500, attached as Ex. E-1 to Pl.'s Resp. to M.S.J.'s).

The investigation reports concerning the second and third drug buys did not list Paul Sammons under the headings of "suspect" or "accused" or mention him in any way.  (Invest. Rpts. 8500-0501 and 8500-0502, attached as Exs. C and D to Barker's M.S.J.).  Under the heading "suspect," the two reports state, "[n]one other than the accused."  (Invest. Rpt. 8500-0501, attached as Ex. C to Barker's M.S.J.).  The accused consisted solely of Virgil Sammons for the reports of the second and third

drug buys.  (Id.; Invest. Rpts. 8500-0502, attached as Ex. D to Barker's M.S.J.).

Deputy Barker and Sergeant Lester admit basic steps were not taken in the course of misidentifying the plaintiff as a suspect.  (Barker Depo. at 75-77, attached as Ex. A to Pl.'s Resp. to M.S.J.'s; Lester Depo. at 34-35, attached as Ex. B to Pl.'s Resp. to M.S.J.'s).  Sergeant Lester acknowledged that he did not review the CI's statements in conjunction with watching the videotape.  (Lester Depo. at 35, attached as Ex. B to Pl.'s Resp. to M.S.J.'s).  They failed to watch the videotape together and, at their depositions, thought they had failed to consult with the CI regarding the identification.  (Barker Depo. at 75-77, attached as Ex. A to Pl.'s Resp. to M.S.J.'s; Lester Depo. at 34-35, attached as Ex. B to Pl.'s Resp. to M.S.J.'s).  Plaintiff chastises Deputy Barker and Sergeant Lester for failing to conduct a Department of Motor Vehicles or criminal history check on his identity, (Pl.'s Resp. to M.S.J.'s at 18), which, according to Trooper Robinson, task force members often use to identify suspects.  (Robinson Depo. at 26-27, attached as Ex. C to Pl.'s Resp. to M.S.J.'s).

C.   <u>Plaintiff's Indictment, Arrest, Incarceration, and Subsequent
     Release</u>

          On or before September 26, 2005, Sergeant Lester
testified before a Mingo County grand jury which returned a two-
count indictment against plaintiff for delivery of a controlled
substance and conspiracy to deliver a controlled substance.
(Indictment, attached as Ex. I to Barker's M.S.J.; Pl.'s Resp. to
M.S.J.'s at 5).

          Sometime on September 26 or 27, 2005, plaintiff's wife
noticed a blurb in the <u>Willamson Daily News</u>, which read
"[c]apiases were issued for the arrest of . . . Paul Sammons, age
and address not available, charged with delivery of a controlled
substance and conspiracy to deliver a controlled substance."
(Paul Sammons Depo. at 55-56, attached as Ex. J to Barker's
M.S.J.; Newspaper Excerpt, attached as Ex. H to Pl.'s Resp. to
M.S.J.'s; Pl.'s Resp. to M.S.J.'s at 5).  On September 27, 2005,
Paul Sammons appeared at the Office of the Mingo County Sheriff
Lonnie Hannah to protest his innocence.  (<u>Id.</u>).  Plaintiff was
then placed under arrest, handcuffed, taken into custody by two
deputies, and transported to the Southwestern Regional Jail in
Holden, West Virginia.  (Paul Sammons Depo. at 55-58, attached as
Ex. J to Barker's M.S.J.).

11

Sometime thereafter, Sergeant Lester was instructed by someone in the prosecutor's office that a still photograph of the plaintiff was needed. (Lester Depo. at 28-29, attached as Ex. H to Barker's M.S.J.). As he reviewed the videotape this time to print a still photograph, Sergeant Lester realized that the plaintiff did not appear in the portion of the videotape depicting the drug transaction at the second truck presumably because he was in fact in the first truck.[4] (Id.). The Mingo County Prosecuting Attorney was promptly advised of this revelation and the charges against the plaintiff were dismissed. (Id.). The corrective nolle prosequi order entered on November 3, 2005, stated "[u]pon further review of the evidence, West Virginia State Police Sergeant J. Lester confirmed that Paul Sammons was mistakenly identified and did not participate in the charged offenses." (11-03-05 St. Ct. Order, attached as Ex. I to Pl.'s Resp. to M.S.J.'s). Plaintiff was released from custody on November 3, 2005, after spending 38 days in the South Regional Jail. (Jail Records, attached as Ex. K to Barker's M.S.J.; Pl.'s Resp. to M.S.J.'s at 5).

---

[4] An issue that is not fully addressed is how Sergeant Lester realizes his mistake during the attempt to print a still photograph of the plaintiff. It is not clear why he watched the videotape through to the drug transaction then but did not do so before.

On November 17, 2006, plaintiff filed this action in the Circuit Court of Kanawha County, and defendants removed the case to this court on March 2, 2007.  On August 27, 2007, the court granted plaintiff's motion to amend the complaint to limit recovery against Sergeant Lester and Troopers Smith and Robinson to the extent of the limits of the state's liability insurance coverage.  On February 6, 2008, the court denied the motion to dismiss of Troopers Smith and Robinson who have since been voluntarily dismissed by plaintiff.  At the same time, the court dismissed the Boone County Sheriff's Department and granted Deputy Barker's motion to dismiss to the extent the claims alleged in Counts II and III were for false arrest and false imprisonment and denied it as to the remainder of the motion.

II.

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Material facts are those necessary to

13

establish the elements of a party's cause of action.  <u>Anderson v.</u>
<u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing
the record and all reasonable inferences drawn therefrom in a
light most favorable to the non-moving party, a reasonable fact-
finder could return a verdict for the non-movant. <u>Id.</u>  The moving
party has the burden of showing -- "that is, pointing out to the
district court -- that there is an absence of evidence to support
the nonmoving party's case." <u>Celotex Corp. v. Catrett</u>, 477 U.S.
317, 325 (1986).  If the movant satisfies this burden, then the
non-movant must set forth specific facts as would be admissible
in evidence that demonstrate the existence of a genuine issue of
fact for trial.  Fed. R. Civ. P. 56(c); <u>Id.</u> at 322-23.  A party
is entitled to summary judgment if the record as a whole could
not lead a rational trier of fact to find in favor of the non-
movant.  <u>Williams v. Griffin</u>, 952 F.2d 820, 823 (4th Cir. 1991).

Conversely, summary judgment is inappropriate if the
evidence is sufficient for a reasonable fact-finder to return a
verdict in favor of the non-moving party.  <u>Anderson</u>, 477 U.S. at
248.  Even if there is no dispute as to the evidentiary facts,
summary judgment is also not appropriate where the ultimate
factual conclusions to be drawn are in dispute.  <u>Overstreet v.</u>

14

<u>Kentucky Cent. Life Ins. Co.</u>, 950 F.2d 931, 937 (4th Cir. 1991).

A court must neither resolve disputed facts nor weigh the evidence, <u>Russell v. Microdyne Corp.</u>, 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility.  <u>Sosebee v. Murphy</u>, 797 F.2d 179, 182 (4th Cir. 1986).  Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor.  <u>Charbonnages de France v. Smith</u>, 597 F.2d 406, 414 (4th Cir. 1979).  Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."  <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962).

### III.

The amended complaint alleges violations of the Fourth, Fifth, Eighth, and Fourteenth Amendments of the United States Constitution and "corresponding Articles" of the West Virginia Constitution (Count I), negligence (Count II), and respondeat superior (Count III).  (Am. Compl. ¶¶ 28-35).  The court divides the federal and state portions of Count I for the purpose of analysis.

15

A.   Count I -- 42 U.S.C. § 1983

Title 42 U.S.C. § 1983 provides in pertinent part as follows:

> Every person who, under color of any statute,
> ordinance, regulation, custom, or usage, of any State .
> . . subjects, or causes to be subjected, any citizen of
> the United States . . . to the deprivation of any
> rights, privileges, or immunities secured by the
> Constitution . . . shall be liable to the party injured
> in an action at law . . . .

42 U.S.C. § 1983.

1.   The West Virginia State Police -- not a person as
defined by 42 U.S.C. § 1983

The Eleventh Amendment bars suits against a state or state agency for money damages.  A state agency is not a "person" within the meaning of 42 U.S.C. § 1983 and can be sued only for injunctive relief.  Will v. Michigan Dep't of State Police, 491 U.S. 58, 67 (1989).  Plaintiff has not disputed or otherwise addressed this matter.  (Lester and W.V.S.P. Reply to Resp. to M.S.J. at 1).  Because Will determined that a state entity such as the State Police is not a "person" under the Act, sovereign immunity has not been waived for § 1983 claims and the West Virginia State Police is immune.  The § 1983 portion of Count I against the West Virginia State Police for money damages is thus barred by the Eleventh Amendment.  See Will, 491 U.S. at 67.

16

## 2. Sergeant Lester in his Official Capacity

Section 1983 claims against state officials acting in their official capacity are barred as well.  Id. at 71.  The Court explained as follows:

> Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.  Brandon v. Holt, 469 U.S. 464, 471, 105 S.Ct. 873, 877, 83 L.Ed.2d 878 (1985).  As such, it is no different from a suit against the State itself.  See, e.g., Kentucky v. Graham, 473 U.S. 159, 165-166, 105 S.Ct. 3099, 3104-3105, 87 L.Ed.2d 114 (1985); Monell, supra, at 690, n. 55, 98 S.Ct., at 2035, n. 55.

Id.  The § 1983 component of Count I against Sergeant Lester in his official capacity is barred by the Eleventh Amendment.

State officials may, however, be sued in their individual or personal capacity and are not absolutely immune from personal liability under § 1983 solely by virtue of the official nature of their acts.  Hafer v. Melo, 502 U.S. 21, 23 (1991).  "[T]he phrase 'acting in their official capacities' is best understood as a reference to the capacity in which the state officer is sued, not the capacity in which the officer inflicts the alleged injury."  Id. at 26-27.  When an individual is sued in his personal capacity, as here, dismissal pursuant to Will is inappropriate.  White v. Gregory, 1 F.3d 267, 269-270 (4th Cir. 1993).

17

3.   Deputy Barker in his Official Capacity

With respect to § 1983 cases, "[o]fficial-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" Kentucky v. Graham, 473 U.S. 159, 165-166 (1985) (quoting Monell v. New York City Dep't. of Social Services, 436 U.S. 658, 690 n. 55 (1978)). "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." Id. at 166. (internal citation omitted).  "It is not a suit against the official personally, for the real party in interest is the entity," which in this case is the Boone County Commission.  Id.  "[I]n an official-capacity suit the entity's 'policy or custom' must have played a part in the violation of federal law."  Id. (internal citations omitted).

Plaintiff does not identify any policy or custom of the Boone County Sheriff's Department or Boone County Commission that could have played a part in the commission of a violation of federal law.  Indeed, plaintiff "acknowledges that generally, in claims involving 42 U.S.C. [§] 1983, the governmental entity cannot be held vicariously liable [for] the unlawful acts of its employees." (Pl.'s Resp. to M.S.J.'s at 22).  Accordingly, the § 1983 component of Count I asserted against Deputy Barker in his

18

official capacity is dismissed.

>        4.   Qualified Immunity of Deputy Barker and Sergeant
>             Lester

        Deputy Barker contends that claims arising from pre-
trial seizure and confinement of an individual resulting from a
grand jury indictment are analyzed under the Fourth Amendment,
rather than the Fifth, Eighth, or Fourteenth Amendments, and
plaintiff does not dispute this contention.  (Barker Memo. in
Supp. of M.S.J. at 6).  Although the parties do not discuss the
Fourteenth Amendment, it also has an important role to play in
this case.

        The Fourth Amendment applies to the conduct down to the
arrest, <u>see</u>, <u>e.g.</u>, <u>Wilson v. Flynn</u>, 429 F.3d 465, 467-468 (4th
Cir. 2005).  The plaintiff, however, was detained for 38 days
following the arrest as a result of the defendants' acts.
"Fourth Amendment protections do not extend to arrestees or
pretrial detainees."  <u>Orem v. Rephann</u>, --- F.3d ----, 2008 WL
1850794, *2 (4th Cir. 2008).  The plaintiff's "status as an
arrestee requires application of the Fourteenth Amendment."  <u>Id.</u>

        "The precise point at which a seizure ends (for
purposes of Fourth Amendment coverage) and at which pretrial
detention begins (governed until a conviction by the Fourteenth

19

Amendment) is not settled . . . ."  <u>Hicks v. Moore</u>, 422 F.3d
1246, 1253 n. 7 (11th Cir. 2005).  Indeed, "[t]he point at which
Fourth Amendment protections end and Fourteenth Amendment
protections begin is often murky."  <u>Orem</u>, --- F.3d ----, 2008 WL
1850794, *2.  It is important to note that "at some point after a
person is arrested, the question whether his continued
confinement or prosecution is unconstitutional passes over from
the Fourth Amendment to the due process clause . . . ."  <u>Jones v.
City of Chicago</u>, 856 F.2d 985, 994 (7th Cir. 1988) (internal
citations omitted).

        The wrongful arrest and ensuing wrongful detention of
the plaintiff resulting from the wrongful arrest puts this case
on both sides of the division between the Fourth and Fourteenth
Amendments.  The court, therefore, analyzes the issue under both
the Fourth Amendment and Fourteenth Amendment.

        The Supreme Court summed up the two-step analysis
governing claims of qualified immunity in <u>Saucier v. Katz</u>, 533
U.S. 194, 201-02 (2001).  First, the threshold question is as
follows: "Taken in the light most favorable to the party
asserting the injury, do the facts alleged show the officer's
conduct violated a constitutional right?".  <u>Id.</u> at 201.

        If so, the second "step is to ask whether the right was
clearly established.  This inquiry, it is vital to note, must be

undertaken in light of the specific context of the case, not as a broad general proposition . . . ." Id.  The right must be "'"clearly established" in a . . . particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Id. at 202 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. (citations omitted).

     "The plaintiff bears the burden of proof on the first [Saucier] question -- i.e., whether a constitutional violation occurred."  Henry v. Purnell, 501 F.3d 374, 377 (4th Cir. 2007) (internal citations omitted).  "The defendant bears the burden of proof on the second [Saucier] question -- i.e., entitlement to qualified immunity."  Id. at 378.

     Our court of appeals has observed that the question of qualified immunity would ordinarily be resolved at the summary judgment stage.  Schultz v. Braga, 455 F.3d 470, 476 (4th Cir. 2006) (internal citation omitted).

     However, qualified immunity does not "override the
     ordinary rules applicable to summary judgment

21

proceedings." "[T]he purely legal question of whether
the constitutional right at issue was clearly
established' is always capable of decision at the
summary judgment stage,'" but "a genuine question of
material fact regarding '[w]hether the conduct
allegedly violative of the right actually occurred . .
. must be reserved for trial.'"

Id. (internal citations omitted).

Deputy Barker and Sergeant Lester each contend
plaintiff has not met his burden on the first Saucier query by
demonstrating the defendants' conduct violated a constitutional
right. (Barker's Memo. in Supp. of M.S.J. at 7-12; Lester and
W.V.S.P's Memo. in Supp. of M.S.J. at 8).

### a.   Fourth Amendment

"'[T]he Fourth Amendment prohibits law enforcement
officers from making unreasonable seizures, and seizure of an
individual effected without probable cause is unreasonable.'"
Miller v. Prince George's County, MD, 475 F.3d 621, 627 (4th Cir.
2007) (quoting Brooks v. City of Winston-Salem, 85 F.3d 178, 183
(4th Cir. 1996), citing Malley, 475 U.S. 335, 106 S.Ct. 1092, 89
L.Ed.2d 271; Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57
L.Ed.2d 667 (1978)); see also Smith v. Reddy, 101 F.3d 531, 536
(4th Cir. 1996). Conversely, "[a]n arrest based on probable
cause does not violate the fourth amendment, even if the wrong
person is arrested." Mensh v. Dyer, 956 F.2d 36, 39 (4th Cir.

22

1991) (internal citations omitted).  Citing <u>Wadkins v. Arnold</u>,
214 F.3d 535, 538 (4th Cir. 2000), plaintiff correctly asserts he
had a constitutional right to be free from arrest absent probable
cause.  (Pl.'s Resp. to M.S.J.'s at 10).

     Initially, it should be noted that there was not, if
the truth had been known, probable cause to make the arrest of
the plaintiff with respect to the first drug buy.  (11-03-05 St.
Ct. Order, attached as Ex. I to Pl.'s Resp. to M.S.J.'s).  But
that is not the test for determining whether the defendants have
contravened the Fourth Amendment.  <u>See</u> <u>Anderson</u>, 483 U.S. at 641
("We have recognized that it is inevitable that law enforcement
officials will in some cases reasonably but mistakenly conclude
that probable cause is present, and we have indicated that in
such cases those officials -- like other officials who act in
ways they reasonably believe to be lawful -- should not be held
personally liable.").  When analyzing a claim for a violation of
the Fourth Amendment, "the question is not whether there actually
was probable cause . . . but whether an objective law officer
could reasonably have believed probable cause to exist."  <u>Gomez</u>
<u>v. Atkins</u>, 296 F.3d 253, 261-262 (4th Cir. 2002), <u>cert. denied</u>,
537 U.S. 1159 (2003) (citing <u>Torchinsky v. Siwinski</u>, 942 F.2d
257, 260 (4th Cir. 1991)).  In assessing probable cause under the
applicable objective reasonableness standard, the court must
"'examine the totality of the circumstances known to the officer

at the time of the arrest.'"[5]  Id. at 262 (internal citations omitted).

In his response, plaintiff often discusses the issue as whether the defendants have acted reasonably but this

---

[5] Our court of appeals further summarized the myriad of additional guiding principles and relevant considerations in assessing whether defendants could have a reasonable belief that probable cause existed.

First, the determination and existence of probable cause is a "practical, nontechnical conception," and it involves "factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Brinegar v. United States, 338 U.S. 160, 175-76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). Furthermore, in determining whether probable cause exists, the evidence "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." Illinois v. Gates, 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

Probable cause will be found to exist when "the facts and circumstances within an officer's knowledge -- or of which he possesses reasonably trustworthy information -- are sufficient in themselves to convince a person of reasonable caution that an offense has been or is being committed." Wadkins v. Arnold, 214 F.3d 535, 539 (4th Cir. 2000) (citing Brinegar, 338 U.S. at 175-76, 69 S.Ct. 1302). While probable cause demands "more than a mere suspicion, . . . evidence sufficient to convict is not required." Taylor [v. Watters], 81 F.3d [429,] 434 [(4th Cir. 1996)] (citing Wong Sun v. United States, 371 U.S. 471, 479, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)). And reasonable law officers need not "resolve every doubt about a suspect's guilt before probable cause is established." Torchinsky, 942 F.2d at 264 (citation omitted).

Gomez, 296 F.3d at 262.

mischaracterizes the inquiry.  A cognizable § 1983 claim requires
more.  Allegations of "'negligence or innocent mistake'" by an
officer will not provide a basis for a constitutional violation.
<u>Miller</u>, 475 F.3d at 627-628 (quoting <u>Franks</u>, 438 U.S. at 171, 98
S.Ct. 2674).

        To succeed on his claim that a reasonable officer would
not have believed probable cause to exist, plaintiff must show
Deputy Barker or Sergeant Lester made material misrepresentations
or omissions of fact in securing plaintiff's arrest either
deliberately or with reckless disregard for the truth.  <u>Miller</u>,
475 F.3d at 627 (quoting <u>Franks</u>, 438 U.S. at 171, citing <u>United
States v. Colkley</u>, 899 F.2d 297, 300 (4th Cir. 1990)).  At this
juncture, the court in taking the evidence in the light most
favorable to the plaintiff finds the materiality element is met
inasmuch as Deputy Barker and Sergeant Lester admit that the
plaintiff was wrongfully identified as a participant in the first
drug buy.

        The issue remains whether Deputy Barker or Sergeant
Lester acted deliberately or with reckless disregard for the
truth by including the plaintiff as a suspect in connection with
the first buy, keeping in mind that the court must review the
facts in the light most favorable to the plaintiff.  Plaintiff
has not alleged that Deputy Barker and Sergeant Lester have acted
deliberately but appears to contend they have shown a reckless

disregard for the truth by stating in his response that the failures of the defendants "are so great that any reasonable officer would have known that probable cause did not exist . . ." (Pl.'s Resp. to M.S.J.'s at 21).

"'Reckless disregard' can be established by evidence that an officer acted 'with a high degree of awareness of [a statement's] probable falsity,' that is, 'when viewing all the evidence, the affiant[6] must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported.'" <u>Miller</u>, 475 F.3d at 627 (internal quotation and citations omitted). Allegations of "'negligence or innocent mistake'" by an officer do not meet the "reckless disregard for the truth" standard. <u>Id.</u> at 627-628 (quoting <u>Franks</u>, 438 U.S. at 171, 98 S.Ct. 2674).

The facts relevant to this issue are largely undisputed. All of the following facts are accepted: Deputy Barker watched the videotape and saw the first truck and the second truck; Deputy Barker requested that Sergeant Lester view

---

[6] The record in this case could be more specific as to how the investigation reports translated into the plaintiff's arrest other than the indication that plaintiff was indicted based, in part, on the testimony of Sergeant Lester. Neither of the parties cited <u>Miller</u>, which involved a formal warrant, and no argument was advanced as to why the defect in the investigation report of the first buy should be treated materially different than a formal warrant application.

the videotape and asked Lester to identify one of the individuals in "the truck"; Sergeant Lester responded that the individual was the plaintiff; and Deputy Barker amended the investigation report to add Paul Sammons as a suspect based on Sergeant Lester's response.  (Barker Depo. at 61-66, 71, attached as Ex. A to Barker's M.S.J.; Lester Depo. at 27-31, attached as Ex. H to Barker's M.S.J.).

There is, however, one portion of the narrative that is unclear.  (Id.).  The specific direction given in the conversation between Deputy Barker and Sergeant Lester in which Deputy Barker requests that Sergeant Lester view the videotape and identify the suspect remains murky.  (Id.).

There are two possibilities stemming from Deputy Barker's deposition testimony quoted at pages 6-7, infra.  (Id.). The first is that Deputy Barker asked Sergeant Lester to simply identify the man in the truck.  The second is that Deputy Barker directed Sergeant Lester to identify the man in the truck in which the drug transaction occurred.

Deputy Barker's role in the wrongful arrest of the plaintiff included both the request to Sergeant Lester to watch the videotape and the subsequent reliance on Sergeant Lester's misidentification.  Assuming the first factual possibility -- that Deputy Barker asked Sergeant Lester to identify the man in

27

the truck with no more specific, detailed direction -- it cannot
be said that Deputy Barker asked a question he knew would lead to
an apprehension of the wrong person.  A reasonable officer could
presume, though incorrectly in this case, that Sergeant Lester, a
member of the four-man team who would have been generally aware
of the drug buy events taking place on December 2, 2004, would
watch the videotape through the portion containing the drug
transaction and correctly identify the plaintiff.  No jury could
find, based on any evidence in the record, that a reasonable
officer would have obvious reasons to doubt Sergeant Lester's
assertion that he watched the videotape and identified the
suspect.  See Miller, 475 F.3d at 627.  In short, the reliance on
Sergeant Lester's identification in naming the plaintiff as a
suspect was reasonable.  The adverse policy implications that
would ensue were law enforcement officers unable to rely on their
colleagues for fear of being sued are self-evident.

         If the more specific direction regarding the individual
participating in the drug transaction were incorporated in the
request to Sergeant Lester, a reasonable officer would have even
more of a reason to believe Sergeant Lester correctly identified
the plaintiff, and Deputy Barker's designation of plaintiff would
quite clearly be reasonable.

         With respect to Sergeant Lester, he is absolved of any
liability under the first factual possibility.  No jury could

find that he acted with reckless disregard for the truth if
Deputy Barker asked him simply to identify the man in the truck.
As his deposition testimony made clear, Sergeant Lester watched
the video, saw the plaintiff in the truck, and advised Deputy
Barker that the man in the truck was the plaintiff. (Lester
Depo. at 27-31, attached as Ex. A to Pl.'s Resp. to M.S.J.).

Assuming the more detailed direction were given to
Sergeant Lester, his misidentification in the second possibility
was still no more than a mistake. Sergeant Lester's deposition
testimony was that, at the time, he did not realize there was a
second truck. (Id.). While the failure to watch the videotape
through the portion containing the drug transaction may be sloppy
police work and certainly was not diligent, there is no evidence
his misidentification was done "deliberately" or with "serious
doubts as to the truth" sufficient to warrant a constitutional
injury. See Miller, 475 F.3d at 627.

Plaintiff's response makes the offhand, unsubstantiated
statement that "[a] review of the video demonstrates that the
passenger of the Anthony Sammons [first] vehicle cannot be
determined." (Pl.'s Resp. to M.S.J.'s at 19). If this is true,
Lester's after-the-fact assertions that he simply identified the
man in the wrong truck would be impugned, irrespective of which
of the two factual possibilities occurred in Deputy Barker's
request to Sergeant Lester. If this were established, it might

allow a reasonable jury to find Sergeant Lester acted deliberately or with reckless disregard for the truth in misidentifying the plaintiff such that summary judgment would be inappropriate.  The court, however, is not permitted on summary judgment to consider unsupported statements in a brief.  See Fed. R. Civ. P. 56.  Further, the court has been unable to view the videotape as it is not in the record.

        Plaintiff notes that Sergeant Lester did not review the CI's statements in conjunction with his identification.  (Lester Depo. at 35, attached as Ex. B to Pls.' Resp. to M.S.J.'s). While not optimal procedure, the failure to review the CI statement does not warrant a finding that he acted with serious doubts of the truth of the identification.  See Wadkins, 214 at 543 ("That his efforts could have been more thorough, or even that his actions may have been mistaken, does not mean that they were unreasonable.").  Even had Sergeant Lester reviewed the CI's statement with respect to the first drug buy, it is unclear as to how many trucks were at the scene.  The CI's written statement, in relevant part, indicated,

> [w]hen I was going up the hollow, I was stopped in
> traffic, and I spoke w/ Anthony [illegible], Virgil's
> son.  I told him what I wanted, and he said that Virgil
> should be back any minute.  I then saw him pull in
> behind me.  He spoke with Anthony for a minute and
> Virgil said come here, and he showed me what he had in
> his hand.  I said okay and I gave him the $100 for it.
> He said come back, and I will have powder at six
> o'clock.

30

(CI's St'ment Re: First Drug Buy, attached as Ex. E to Barker's
M.S.J.).  A review of the CI's statement thus might not have made
a difference in cuing Sergeant Lester that the man in the second
truck was the subject of Deputy Barker's inquiry.

Plaintiff places emphasis on our court of appeals'
decisions in <u>Clipper v. Takoma Park</u>, 876 F.2d 17, 20 (4th Cir.
1989) and <u>Sevigny v. Dicksey</u>, 846 F.2d 953, 957-958 (4th Cir.
1988).  (Pl.'s Resp. to M.S.J.'s at 12).  He describes the two as
holding "that a law enforcement officer's failure to pursue
easily obtainable pieces of information that could completely
exculpate a suspect weighed heavily against a finding that the
officer's conduct was reasonable."  (<u>Id.</u>).  As Barker's reply
clarifies, (Barker Reply to Resp. to M.S.J. at 10), a more
complete statement of the law is the firmly established principle
that "[a]lthough an officer may not disregard readily available
exculpatory evidence of which he is aware, an officer's failure
to pursue a potentially exculpatory lead is not sufficient to
negate probable cause."  <u>McKinney v. Richland County Sheriff's
Dep't.</u>, 431 F.3d 415, 418-419 (4th Cir. 2005) (quoting <u>Wadkins</u>,
214 F.3d at 541); <u>Gomez</u>, 296 F.3d at 262; <u>Smith</u>, 101 F.3d at 357;
<u>Torchinsky</u>, 942 F.2d at 264; <u>Clipper</u>, 876 F.2d at 20; <u>Sevigny</u>,
846 F.2d at 957-58.

In <u>Clipper</u>, the court of appeals considered an appeal

31

of a jury verdict in favor of the plaintiff, Clipper.  876 F.2d
at 18.  Clipper was wrongfully arrested when the police suspected
him of being the getaway driver in a bank robbery attempt that
went awry.  Id. at 18-19.  It was concluded that there was ample
evidence to support the jury's verdict inasmuch as the
combination of the following factors were present: (1) the
failure of the officers to investigate Clipper's alibis
corroborating his explanation that he could not have been the
driver; (2) the failure to consider the statement made by the
officer, who first responded to the bank robbery, to the
arresting officer which indicated that Clipper looked like the
driver but he was not sure; (3) the failure of the officers to
obtain FBI surveillance pictures prior to or after the arrest,
which Clipper contended would have conclusively established that
he was not the man involved in the robbery; and (4) generally
"the speculative nature of other information . . . which the
arresting officer relied upon in making the arrest."  Id. at 18-
20.  Nevertheless, the court of appeals specifically noted the
failure to investigate leads was not in and of itself sufficient
to negate probable cause.  Id. at 20.

     In Sevigny, the court considered another appeal of a
jury verdict in favor of the plaintiff, Sevigny.  The court of
appeals first noted the officer arrested Sevigny when "he was
totally uncertain about what had happened."  Sevigny, 846 F.2d at

957.  This was apparent when the officer "charge[d] her with two separate offenses -- for whatever had occurred."  Id.  The first was that Sevigny herself had run her car into the building.  Id.  The second was that Sevigny's child had done so.  Id.  "Both obviously could not be proven, and any officer acting reasonably would have realized . . . probable cause for both [was] highly questionable."  Id.  As an added reason to question the officer's sincere belief of probable cause, the court noted that the officer "did not avail himself of readily available information" with "even rudimentary inquiries of neighbors" that would have "flatly ruled out" the offense that she had caused the property damage.  Id. at 957-958.  The court of appeals noted there was no exigency and the officer did not act reasonably under the circumstances to clarify the factual situation.  Id. at 958.  "To the extent the officer's arrest was based on a misapprehension of the facts confronting him," Sevigny found, "his misapprehension was not a reasonable one."  Id.

Clipper and Sevigny are both in accord with the Miller standard, previously articulated, that qualified immunity will only be lost when a police officer must have "serious doubts" about the truth of the information he puts forth.  See Miller, 475 F.3d at 627.  The officer in Clipper knew that the only eyewitness was unsure as to whether the plaintiff was the person he saw driving the getaway car.  876 F.2d at 18-19.  The officer

33

in Sevigny must have had serious doubts about probable cause because one of the two offenses being charged had to be incorrect.  846 F.2d at 957.  Moreover, Clipper and Sevigny did not state that the officer's failure to pursue evidence was, in and of itself, determinative in the decision to side with the plaintiff.  Clipper, 876 F.2d at 20; Sevigny, 846 F.2d at 958.

        In arguing for immunity not to apply, plaintiff also borrows a statement from the Seventh Circuit Court of Appeals that an officer "may not close her or his eyes to facts that would help clarify the circumstances of an arrest."  BeVier v. Hucal, 806 F.2d 123, 128 (7th Cir. 1986).  Deputy Barker and Sergeant Lester did not "close their eyes" or otherwise ignore evidence.  They simply misread the evidence they possessed.  "Not every mix-up in issuance of an arrest warrant . . . automatically constitutes a constitutional violation for which a remedy may be sought."  Thompson v. Prince William County, 753 F.2d 363, 364 (4th Cir. 1985).  The result as analyzed under the Miller standard is not changed by any direction in Clipper, Sevigny, or BeVier.

        Plaintiff further argues that Deputy Barker and Sergeant Lester did not perform the standard procedure in identifying a suspect as testified to by former defendants, Troopers Smith and Robinson.  (Pl.'s Resp. to M.S.J.'s at 24).  Troopers Smith and Robinson testified about how officers may use,

34

in certain circumstances, driver's license pictures on file with the Division of Motor Vehicles in making identifications.  Of course, that would not have helped in this case.  It was not that Sergeant Lester looked at the correct person and identified him as someone else.  He was viewing the wrong individual entirely. Furthermore, plaintiff offers no written policy of the State Police regarding the identification of suspects.  Even if plaintiff were to show an infraction of State Police regulations, "a violation of departmental policy does not equate with constitutional unreasonableness." Abney v. Coe, 493 F.3d 412, 419 (4th Cir. 2007) (internal citations omitted).

Neither Deputy Barker or Sergeant Lester acted with reckless disregard for the truth, regardless of which of the two possibilities occurred in Deputy Barker's request of Sergeant Lester to watch the videotape.  Rather, their conduct was the product of negligence or a mistake that is insufficient for an actionable § 1983 claim.  See Miller, 475 F.3d at 627; Torchinsky, 942 F.2d at 261 ("If reasonable mistakes were actionable, difficult questions of discretion would always be resolved in favor of inaction, and effective law enforcement would be lost.").  While the court views the circumstances in this case with greater scrutiny because there were no exigent circumstances in any portion of the process leading to the wrongful arrest, see Sevigny, 846 F.2d at 958, plaintiff has

adduced no evidence that would allow a jury to conclude that
Deputy Barker or Trooper Lester acted deliberately or with
reckless disregard in the misidentification of the plaintiff and
the subsequent events leading to his indictment, arrest and
detainment.  This misunderstanding was most unfortunate because
it had severe consequences for the plaintiff, but it was just
that -- a misunderstanding.

### b.   Fourteenth Amendment

        Our court of appeals has explained the standard for
analyzing a claim under the Fourteenth Amendment.

> Broadly speaking, the substantive due process provision
> of the Fourteenth Amendment protects against egregious,
> arbitrary governmental conduct.  See County of
> Sacramento v. Lewis, 523 U.S. 833, 845-46, 118 S.Ct.
> 1708, 140 L.Ed.2d 1043 (1998).  Only governmental
> conduct that "shocks the conscience" is actionable as a
> violation of the Fourteenth Amendment.  Id. at 846, 118
> S.Ct. 1708.  As the Supreme Court recognized in Lewis,
> however, determining whether conduct is sufficiently
> egregious to amount to a Fourteenth Amendment violation
> is far from an exact science.  See id. at 847, 118
> S.Ct. 1708 . . . .

Young v. City of Mount Ranier, 238 F.3d 567, 574 (4th Cir. 2001)

(parenthetical omitted).  "The degree of culpability on the part

of a governmental actor that is sufficient to shock the

conscience will depend on the circumstances of any given case."

Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 302 (4th Cir.

36

2004) (internal citations omitted).

The court in <u>Young</u> further explained that,

"liability for negligently inflicted harm is
categorically beneath the threshold of constitutional
due process," and that conduct "intended to injure in
some way unjustifiable by any government interest is
the sort of official action most likely to rise to the
conscience-shocking level." <u>Lewis</u>, 523 U.S. at 849,
118 S.Ct. 1708. Nonetheless, under certain
circumstances, conduct "falling within the middle
range" of culpability -- that is, conduct that is more
than negligent but less than intentional -- can give
rise to liability under the Fourteenth Amendment. <u>Id.</u>

<u>Young</u>, 238 F.3d 567, 574.

As explained previously, the conduct in this case was

negligent and nothing more. Consequently, the actions of the

defendants, though harmful to the plaintiff, do not shock the

conscience such that a violation of the Fourteenth Amendment has

occurred. <u>See</u> <u>id.</u>

Under the analysis pursuant to the first step of

<u>Saucier</u>, the court concludes there was no violation of either the

Fourth Amendment or the Fourteenth Amendment of the United States

Constitution. As a consequence, the question of qualified

immunity need not be reached.

37

IV.

Under 28 U.S.C. § 1367(c)(3), a court has discretion to decline the exercise of supplemental jurisdiction over state law claims if the court "has dismissed all claims over which it has original jurisdiction."  Among the factors that inform this discretionary determination are convenience and fairness to the parties, the existence of any underlying issues of federal policy and comity, and considerations of judicial economy. Carnegie-Mellon University v. Cohill, 484 U.S. 343, 350 n. 7 (1988).  In United Mine Workers of America v. Gibbs, 383 U.S. 715, 726 (1966), the Supreme Court cautioned that "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law."  The Supreme Court further noted that "[c]ertainly if the federal claims are dismissed before trial . . . the state claims should be dismissed as well."  Id.  The Fourth Circuit has read Gibbs as recognizing "the desirability of having state courts interpret questions of state law" and also noted that "the federal interests supporting federal resolution of pendent state claims recede when the federal questions are dismissed."  Mitcheson v. Harris, 955 F.2d 235, 238 (4th Cir. 1992).  Furthermore, if the case has been removed from state court to federal court, after dismissing the federal claims, the federal court may remand the case to state

38

court pursuant to § 1367(c).  See Hinson v. Norwest Fin. S.C., Inc., 239 F.3d 611, 617 (4th Cir. 2001) ("under the authority of 28 U.S.C. § 1367(c), authorizing a federal court to decline to exercise supplemental jurisdiction, a district court has inherent power to dismiss the case or, in cases removed from state court, to remand, provided the conditions set forth in § 1367(c) for declining to exercise supplemental jurisdiction have been met.").

Inasmuch as all of the federal issues have been resolved short of trial and inasmuch further as the remaining state law claims are unrelated to federal policy, the court declines to exercise jurisdiction over the remaining state law claims, to the extent they remain viable.

V.

It is, accordingly, ORDERED as follows:

1.   The motion for summary judgment of Deputy Barker be, and it hereby is, granted as to the portion of Count I asserting a violation of 42 U.S.C. § 1983;

2.   The motion for summary judgment of Sergeant Lester and the West Virginia State Police be, and it hereby is, granted as to the portion of Count I asserting a violation of 42 U.S.C. § 1983, which

39

portion is ordered dismissed; and

3.    Given that the predicate for federal jurisdiction
      has been dismissed, the court declines to exercise
      supplemental jurisdiction over that which remains
      of Counts I, II, and III and, as a consequence,
      the remainder of the action be, and it hereby is,
      remanded to the Circuit Court of Kanawha County.

The Clerk is directed to forward copies of this
memorandum opinion and order to all counsel of record.

DATED: May 2, 2008

John T. Copenhaver, Jr.
United States District Judge

40